UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,      :
         :
     -against-       :
         :       **OPINION AND ORDER**
MICHELE AMABILE,      :       14 M 1043 (VMS)
         :
     Relator.       :
         :
-------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

      In response to a request by the Government of the Republic of Italy ("Italy"), the United

States of America ("the Government") moves under 18 U.S.C. § 3184 to have this Court certify

the extraditability of Relator Michele Amabile ("Mr. Amabile"), a citizen of the United States, to

Italy, which seeks Mr. Amabile on charges pending against him relating to narcotics importation,

mafia-type association and aggravated attempted extortion.  Docket No. 4;[1] Docket No. 16-1

(Italy's extradition request).  Italy makes this extradition request under the Extradition Treaty

between the United States of America and the Government of the Italian Republic, signed

October 13, 1983 ("the 1983 Treaty"), as modified by a written instrument signed by both

nations as contemplated by Article 3(2) of the Agreement on Extradition between the United

States of America and the European Union, signed June 25, 2003.  Docket No. 16-1.

      On January 19, 2015, the United States filed a memorandum of law in support of its

Complaint for the Extradition of Mr. Amabile, made at the request of Italy pursuant to the 1983

---

[1] The Complaint was originally filed sealed with a contemporaneous application for arrest warrant at Docket No. 1.  After the Government arrested Mr. Amabile, the Complaint was unsealed, and the Government filed it at Docket No. 4.  I will hereinafter cite to the Complaint at Docket No. 4.

Treaty as modified, for the Court to certify Mr. Amabile's extraditability on the basis of the narcotic importation and the mafia-type-association charge. Docket No. 16.

Mr. Amabile opposes the United States's request, Docket No. 22, and the United States replies, Docket Nos. 24-25.

On May 21, 2015, I held an extradition hearing. Docket Nos. 26-27. During that hearing, I requested supplemental briefing from the Parties, which they have filed. Docket Nos. 29-30.

For the reasons set forth below, I hereby **grant** the Government's request for certification of extraditability in its entirety.

## I.      Legal Background, Factual Background And Procedural History

The following legal background, factual background and procedural history have been compiled from the Parties' filings, as well as Italy's submissions in support of its extradition request.

### a.   The June 2014 Criminal Charges Brought Against Mr. Amabile In Reggio Calabria, Italy

#### i.   The Reggio Calabria Charges Against Mr. Amabile

On June 10, 2014, a Pre-trial Investigation Judge in Reggio Calabria, Italy, issued an arrest warrant for Mr. Amabile relating to a March 3, 2014 indictment charging him with violating Article 74(1)-(3) of Italian Presidential Decree 309/1990 and Article 4 of Law 146/06.[2] Docket No. 16-3 at 30-41. The same indictment charged Mr. Amabile with violating Article 416(1), (3)-(6) of the Italian Criminal Code. Docket No. 16-3 at 30-41.[3]

---

[2] I will at times refer to this charge as the "narcotics-importation charge" or "drug-trafficking charge."

[3] I will at times refer to this charge as the "mafia-type-association charge."

### ii. A Summary Of The Relevant Italian Law Relating To The Narcotics-Importation Charge And The Mafia-Type-Association Charge

What follows is a summary of the relevant law supporting the narcotics-importation charge and the mafia-type-association charge brought against Mr. Amabile in the Reggio Calabria indictment. <u>Docket No. 16-3</u>.

### 1. The Narcotics-Importation Charge Under Italian Law

As for the narcotics-importation charge, Article 74(1) of Italian Presidential Decree 309/1990 provides that

> [w]hen three or more persons set up an association for the purposes of committing several of the offenses as stated in Article 70, paragraphs 4, 6 and 10[, which in sum and substance criminalize the importation of various controlled substances without government license], . . . any person who promotes, sets up, manages, organizes or funds the association shall be punished by a term of imprisonment of not less than twenty years.

<u>Id.</u>

Article 74(2) and (3) of Italian Presidential Decree 309/1990 contemplate circumstances which aggravate the seriousness of an individual's commission of the narcotics-importation offense described in Article 74(1). <u>Id.</u> For example, Article 74(2) states that "[a]ny person who participates in the association shall be punished by a term of imprisonment of no less than ten years," and Article 74(3) states that "[t]he sentence shall be increased if the number of members is ten or more[.]" <u>Id.</u>

Article 4 of Law 146/2006 also relates to the narcotics-importation charge against Mr. Amabile and provides that

> [t]he penalty for the offences punished by the maximum penalty of imprisonment for no less than four years, committed with the contribution of a criminal organized group, engaged in criminal

activities in more than one States, shall be increased by one third to the half.

Docket No. 4-1 at 39.

### 2. The Mafia-Type-Association Charge Pursuant To Article 416(1), (3)-(6) of Of The Italian Criminal Code

The mafia-type-association charge was brought pursuant to Article 416 of the Italian Criminal Code, which criminalizes various types of involvement with a mafia-type association—for example, the formation, promotion or direction of such a group. Docket No. 16-3 at 50. The law defines a mafia-type association as occurring when

> those who form part thereof avail themselves of the force of intimidation of the bond deriving from being a member of the association and of the consequent condition of subjection and "omertà" (silence of a culpable nature), in order to commit crimes[.]

Docket No. 16-3.

### iii. The Factual Allegations Underlying The Reggio Calabria Charges

### 1. General Factual Allegations Relating To The Narcotics-Importation Charge

The indictment alleges that roughly twenty individuals were involved in the narcotics-importation operation, among them Franco Lupo, Nick Tamburello, Nicola Carrozza, Carlo Brillante, Daniele Cavoto, Alex Chan, Anthony Drossos, Domenico Geranio, Andrew Memmolo, Vincenzo Parrelli, Carlo Piscioneri, Antonio Simonetta, Eugenio Ignelzi, Bledar Halili, Daniel Lacatus, Mario Ursini, Francesco Ursino, Raffaele Valente, Francesco Vonella and José Garcia.[4] Docket No. 16-3 at 31. These Defendants came to the attention of the United States Federal Bureau of Investigation ("FBI") and the Italian National Police ("INP") as a result

---

[4] I will at times refer to these individuals collectively as "Defendants" or "other Defendants."

of a criminal investigation jointly conducted by these law enforcement agencies, and the

Defendants—Mr. Amabile among them—allegedly "associated with one another . . . in order to

commit an indefinite number of crimes involving the import[ation into Italy], the co-possession

and the subsequent sale of a narcotic substance of the cocaine type to third persons." Id. at 30.

### 2. General Factual Allegations Relating To The Mafia-Type-Association Charge

Building upon the alleged narcotics importation, the Defendants—Mr. Amabile among

them—also allegedly committed acts violating Italy's law against a mafia-type association in the

Italian territory of Montefalcone di Val Fortore by making use of the intimidating force of the

association and the condition of submission and law of silence resulting from it. Id. at 31.

Although the indictment states that Mr. Amabile was one of roughly twenty Defendants involved

in narcotics importation, the indictment alleges that Mr. Amabile was part of the mafia-type

association with a subset of five of those roughly twenty other Defendants. Id. The mafia-type

association allegedly employed firearms in the course of its drug-trafficking activities, with Mr.

Brillante and Mr. Valente allegedly playing particularly prominent roles in the planning,

management and promotion of the association. Id. at 31.

### 3. Specific Allegations Connecting Mr. Amabile To Narcotics Importation And/Or Participation In A Mafia-Type Association

#### a. The Government's Sealed Affidavit Shows That Mr. Amabile Is The "Michele" Referred To In The Italian Indictment's Allegations

In support of the factual allegations made in the Reggio Calabria indictment bringing the

narcotics-importation and mafia-type-association charges against Mr. Amabile, the United States

has provided the Court and Mr. Amabile's counsel with a sealed affidavit from an FBI agent

("the Affidavit"). Docket No. 25.[5] As the Affidavit is sealed to protect confidential information contained therein, I will only discuss its contents in broad terms.[6]

Mr. Amabile complains that the Italian indictment, which refers to a co-conspirator named "Michele," never establishes why law enforcement believes that Mr. Amabile is "Michele." Docket No. 30. The Affidavit sets forth the United States Government's reason for believing that that Mr. Amabile is "Michele," which is that the affiant attests to personal knowledge of that fact and provides the Court with the foundation for that knowledge. Docket.

---

[5] The Government served the Affidavit upon Mr. Amabile's counsel and moved to have the Affidavit sealed and subject to a protective order. Docket No. 24. The Government states that the reason for its motion is that the Affidavit, if publicly available, would endanger the safety of a cooperating witness mentioned therein. Id. As Mr. Amabile's counsel does not object and it is in the interest of safety and the public, I **grant** the motion and the Affidavit, which was filed sealed on the docket in the first instance, will remain sealed and subject to the Government's proposed protective order unless and until an order unsealing it is entered. Id.

[6] I note that United States extradition law permits me to consider this document as I weigh Mr. Amabile's extradibility. In Duca v. United States, No. 95 Civ. 713 (DGT), 1995 WL 428636, at *12 (E.D.N.Y. July 7, 1995), aff'd by Lo Duca v. United States, 93 F.3d 1100 (2d Cir. 1996), the Court held that the 1983 Treaty and other extradition law does not "restrict the record in an extradition proceeding to the documentary evidence submitted by the requesting country," and it is "entirely appropriate" for a judge to consider additional documents. See In re Extradition of Orellana, No. 00 M. 1 (HB) (RLE), 2001 WL 266073, at *5 n.1 (S.D.N.Y. Mar. 15, 2001) (finding probable cause that the extraditee committed the charged offense because, in addition to the authenticated Mexican documents, the extraditee confessed to the crime before American authorities, which was admissible evidence at the extradition hearing); Galen Valencia v. Scott, Nos. 90 Civ. 3745, 91 Civ. 1959 (RJD), 1992 WL 75036, at *2 (E.D.N.Y. Mar. 24, 1992) (noting that petitioners' "argu[ment] that the [magistrate judge's] finding of probable cause in an extradition proceeding can only be based on the formal submission by the requesting government . . . is without support" and that 18 U.S.C. §§ 3184, 3190 do not impose "any limitation on the scope of the record"); Desautels v. U.S., 782 F. Supp. 942, 943 (D. Vt. 1991) ("The statute requir[ing] that the extradition magistrate [judge] admit into evidence documents authenticated and certified in the manner specified[, 18 U.S.C. § 3190,] does not preclude the introduction of evidence authenticated in a different manner, such as through the testimony of appropriate witnesses."); Matter of Extradition of Artukovic, 628 F. Supp. 1370, 1376 (C.D. Cal. 1986) (stating that "[w]hile § 1390 makes evidence certified as admissible in the tribunals of the requesting country admissible in our courts, it is not true that the Government may introduce evidence only by way of such certification," and permitting the Government's own submission of an English translation of a document), overruled on other grounds, Lopez-Smith v. Hood, 121 F.3d 1322 (9th Cir. 1997).

No. 25.[7]  As I have read the affiant's explanation and find it convincing, going forward I

consider Mr. Amabile to be the "Michele" referred to in the Italian indictment.

> **b.   The Fact Allegations Contained In The Reggio Calabria Indictment Bringing The Narcotics-Importation And Mafia-Type-Association Charges Against Mr. Amabile**

I now turn to the Reggio Calabria indictment's allegations in support of the narcotics-

importation and mafia-type-association charges.  The Reggio Calabria allegations are frequently

sourced from recordings of the Defendants' conversations, which the Government's unsealed

Complaint explains were obtained through the FBI and INP's joint investigation using tools such

as pen registers, tap and trace devices and search warrants on email accounts monitored by the

FBI and telephone calls intercepted by the INP.  Docket No. 4.[8]

As noted above, the FBI and the INP conducted a joint investigation into the events

detailed in the Reggio Calabria indictment.  Pursuant to that investigation, law enforcement

learned that Mr. Lupoi and Mr. Valente, among others, helped to organize the cocaine shipment

from South America to Italy through the use of cover hauls, and that Mr. Drossos, among others,

served as an intermediary with the South American suppliers.  Docket No. 16-3 at 30.[9]

---

[7] Mr. Amabile argues that the Court should not accept this explanation because the Affidavit "refers to Mr. Amabile as neither Michele or Mr. Amabile, but another name."  Docket No. 30.  I have read the Affidavit and reject Mr. Amabile's argument that the use of "another name" is significant here.  The affiant's statement shows to my satisfaction that Mr. Amabile is "Michele."  Id.

[8] Accordingly, when I quote specific language from Defendants' conversations as found in the Reggio Calabria indictment, it is reasonable to infer that those quotations were obtained from the aforementioned recordings.

[9] In addition to the Reggio Calabria indictment's recitation of these facts, documents filed in the United States's related prosecutions in this District corroborate the allegations.  See, e.g., U.S. v. Drossos, No. 14 Crim. 396 (SJ), Docket No. 1 (the unsealed complaint); Id., Docket Entry 7/16/2014 (Mr. Drossos pleading guilty to an information charging conspiracy to commit money laundering to promote cocaine trafficking).  For example, as described in a now-unsealed

Against this backdrop, the Reggio Calabria charges allege that in August 2012, Mr. Amabile traveled from the United States to Italy with Mr. Lupoi to attend Mr. Valente's wedding there. Docket No. 16-3 at 31. According to the indictment, this was when Mr. Amabile first became a subject of the FBI and INP's joint investigation, which at the time was already underway with respect to other Defendants. Id.

Law enforcement soon began to suspect that Mr. Valente and Mr. Amabile collaborated with known New York drug trafficker Mr. Drossos on arranging the shipment of 500 kilograms of cocaine to Italy from South America. Id. Specifically, on November 13, 2012, Mr. Lupoi, who was involved in the South America narcotics shipment to Italy using cover hauls, asked Mr. Valente to call Mr. Drossos to discuss problems relating to the shipment. Id. Mr. Valente responded that he would attempt to call Mr. Drossos and that, if that proved unsuccessful, "I am going to make Michele [Amabile] call him[.]" Id.[10] Later, when Mr. Lupoi asked Mr. Valente for an update on arrangements for the transaction, Mr. Valente responded that he had not yet reached Mr. Drossos in New York despite the fact that Mr. Valente "called [Mr. Amabile] and we tried four times to call [Mr. Drossos], we left three or four messages . . . he did not answer[.]" Id. at 32.

On November 17, 2012, Mr. Lupoi asked Mr. Valente the status of the deal. Id. Mr. Valente stated that he tried to call Mr. Drossos fifty times. Id. When Mr. Lupoi later

_____

complaint in a related United States prosecution in this District, an undercover officer ("UC") met with Mr. Lupoi in New York to discuss the shipment of cocaine from South American to Italy using cover hauls, and Mr. Lupoi told the UC "that, in connection with the deal, he was going to introduce the UC to a Greek person whose 'last name is Drossos . . . D-R-O-S-S-O-S.'" Id., Docket No. 1. The UC met Mr. Drossos in Manhattan regarding the progress of the South American suppliers and whether a "dry run" shipment should be made.

[10] The quotations that I repeat from the Reggio Calabria indictment came from investigators' interception of Defendants' telephone calls, as the indictment itself indicates.

commiserated with Mr. Valente over the difficulties that Mr. Lupoi was also having in reaching Mr. Drossos, Mr. Valente expressed hope that "Michele [Amabile]" would have news to report. Id.

Mr. Amabile allegedly continued to attempt to reach Mr. Drossos until, on November 20, 2012, Mr. Valente told Mr. Lupoi that "Michele [Amabile]" had managed to contact Mr. Drossos, who assured Mr. Amabile that the drugs would be shipped according to plan. Id. Mr. Valente had "talked to Michele [Amabile] just now and he told me they are coming and as soon as they come they would call, otherwise call me and pass me the phone to talk to Michele [Amabile]." Id.

On January 17, 2013, Mr. Valente told Mr. Cavoto and Mr. Memmolo that the ship carrying the narcotics was about to set sail for Italy in two or three days and that, when that happened, a number of Defendants—Mr. Valente, Mr. Amabile, Mr. Lupoi, Mr. Fauci and Mr. Pollina—should all travel to Italy to aid in the distribution of the narcotics there: "[W]e have learnt that in 2-3 days that thing is apparently leaving and we should come . . . Now I am going to get information for the ticket . . . Jesus . . . Rocco, Maria, me, Michele [Amabile], Frank [Lupoi], Raimondo [Fauci] should come, all together in one shot[.]" Id. at 32-33.

On January 31, 2013, Mr. Valente called Mr. Brillante to provide an update on the cocaine shipment, and Mr. Valente told Mr. Brillante about the various individuals working on the project. Id. at 33. Mr. Amabile was among the ten-plus individuals that Mr. Valente described to Mr. Brillante. Id. at 33.

On June 7, 2013, Mr. Valente told Mr. Brillante that Mr. Valente and Mr. Amabile would travel to Italy on July 5, 2013, in order to handle the arrival of the cocaine, which was allegedly imminent. Id.

On June 26, 2013, Mr. Valente called Mr. Cavoto and proposed that the Benevento association make Mr. Amabile's involvement official in light of Mr. Amabile's impending arrival in Italy.  Id.  Mr. Valente stated that "Uncle Carlo [Brillante] is available and we can do all the things as they must be done . . . ."  Id.

On July 5, 2013, Mr. Valente arrived in Italy, and Mr. Brillante and a female friend met him at the Naples airport.  Id.  One day later, Mr. Brillante talked to Mr. Tamburello about meeting with the rest of the "group" to deal with the question of Mr. Amabile's participation in the clan.  Id.  Mr. Tamburello stated that Mr. Valente had never talked to him directly about the matter, but that Mr. Amabile himself had brought it up with Mr. Tamburello: "No, I didn't talk to [Mr. Valente] . . . , [but] Michele [Amabile] gave me some indications [and] I want to talk . . . I'll be there in a short while, ok?"  Id.

On July 17, 2013, Mr. Valente was back in New York and gave Mr. Lupoi a letter from Mr. Tamburello in which Mr. Tamburello stated that he had been asked to "join the [Americans'] club," but Mr. Tamburello proposed a different kind of drug-trafficking operation using marble sheets as a "cover haul."  Id.  On July 23, 2013, Mr. Amabile called Mr. Cavoto to ask if Mr. Cavoto could verify with Mr. Brillante whether the marble-sheet operation proposed by Mr. Tamburello was possible because Mr. Amabile had already identified some interested American parties.  Id.  Mr. Amabile suggested to Mr. Cavoto that Mr. Brillante let Mr. Amabile know his opinion on the matter in a Facebook chat.  Id.

On October 14, 2013, Mr. Vonella informed Mr. Tamburello that the transnational collaboration between Mr. Valente in the United States and Mr. Brillante in Italy connected to drugs was made up of approximately nine individuals in New York and seven or eight individuals in Benevento (the Italian group included Mr. Vonella, Mr. Brillante and Mr.

Memmolo: "[I]n America there are already eight or nine, there are seven/eight of us here [in Italy] . . . ." Id. at 33-34.

On October 17, 2013, Mr. Valente called Mr. Cavoto from New York to tell him that Mr. Valente and Mr. Amabile would both be in Italy in a few days, although they would not be traveling together.  Id. at 34.  According to Mr. Valente, "Michele [Amabile] will come afterwards with [unintelligible] . . . they have a thing to see to.  As [for] me . . . we see to our things on our own, . . . little by little . . . a little bit at a time[.]" Id. at 34.

### b.  The November 2014 Criminal Charges Brought Against Mr. Amabile In Potenza, Italy

#### i.  The Potenza Charges Against Mr. Amabile

On November 27, 2014, a Preliminary Investigations Judge in Potenza, Italy, issued an arrest warrant for Mr. Amabile relating to an indictment charging him, among other Potenza Defendants, with aggravated attempted extortion for violating various Articles of the Italian Criminal Code, namely Article 629(2) in connection with 628(3), 56, 81 and 110.  Docket No. 16-5 at 7-10.[11]

#### ii.  A Summary Of The Italian Law Relating To The Aggravated Attempted Extortion Charge

What follows is a summary of the Italian law supporting the aggravated attempted extortion charge brought against Mr. Amabile in the Potenza indictment.

First, Article 629 of the Italian Criminal Code addresses extortion and provides that "[w]hoever by means of force or threats, compels another to do . . . any act, in order to procure, to another's detriment, a wrongful benefit to himself or others, shall be punished by a term of imprisonment of five to ten years[.]" Docket No. 16-5 at 3.  "The punishment will be a term of

---

[11] The indictment includes other aggravating circumstances as well which are irrelevant to the extradition analysis.

six to twenty years . . . if any of the circumstances specified in [Article 628(3)] occur." Id.

The aggravating circumstances contemplated by Article 628(3) of the Italian Criminal Code include, inter alia, commission of the offense by several persons together or by a member of a mafia-type association as per Article 416. Id. at 3-4.

In the event that a criminal defendant did not actually succeed in committing Article 628 or 629, Article 56 of the Italian Criminal Code criminalizes the attempt of the offense. Article 56 explains that "[a]ny person who commits specific acts aimed in an unequivocal manner at committing an offense, shall answer for attempted offense [even] if the action is not carried out or the event does not occur." Id. at 2. Under such circumstances, an attempted offense is punishable by one-third to two-thirds the term of imprisonment contemplated by the intended offense (unless the term of imprisonment is life). Id.

Article 110 clarifies that when more than one person participates in the same offense, each of them shall be subject to the punishment prescribed for the offense. Id. at 3. Article 81 states that any person who, with a single action, violates a number of law provisions, shall be punished with the penalty that should be inflicted for the most serious offense, increased up to three times. Id.

### iii. The Factual Allegations Underlying The Potenza Charges

The indictment alleges that roughly eight individuals were involved in the alleged aggravated attempted extortion of victim Lorenzo Marsilio, among them Mr. Amabile, Mr. Valente, Mr. Brillante, Mr. Cavoto and Mr. Vonella (all of whom were also indicted for narcotics importation in Reggio Calabria), as well as Francesco Palmeri, Salvatore Farina, and Giovanni Grillo.[12] Docket No. 16-3 at 31.

---

[12] In order to not confuse the Potenza charges with the Reggio Calabria charges, any reference to this group of individuals will be as "Potenza Defendants." The summary of the factual

The Government alleges that the extortion charge is based upon Mr. Amabile's involvement in an effort to intimidate Mr. Marsilio, an Italian businessman who had accepted a loan many years prior from an American crime family. Docket No. 4 ¶ 39 (Government's complaint for Mr. Amabile's extradition); Docket No. 16-5 at 8 (the Potenza indictment). Mr. Marsilio repaid the entire amount of money due on that original loan, yet Mr. Amabile and others sought to intimidate Mr. Marsilio into paying additional money to the crime family. Id. In brief, Mr. Amabile's role came when he and other men accompanied an associate to Mr. Marsilio's office and, when the associate entered Mr. Marsilio's office to intimidate him, Mr. Amabile sat with a group of other men in a vehicle outside the office in order so that their physical presence supported the intimidation. Docket No. 4 ¶ 39.

In or around June 2012, Mr. Grillo, the same man who had negotiated Mr. Marsilio's original loan years earlier with the American crime family, told Mr. Marsilio that "those from America" wanted Mr. Marsilio to pay an additional one million euros. Docket No. 16-5 at 7. Mr. Grillo made explicit to Mr. Marsilio that the Americans were "cosa nostra" and that they were uncompromising. Id. Mr. Marsilio received postcards signed by "the friends of Brooklyn" and threatening letters instructing him to "contact one of [their] representatives." Id.

Mr. Palmeri was Mr. Grillo's liaison to the American crime family and would periodically visit Mr. Marsilio himself. Id. For example, in July 2013, Mr. Palmeri traveled to Italy from the United States and drove to visit Mr. Marsilio at his office. Id. Mr. Marsilio was not in, but Mr. Palmeri told one of Mr. Marsilio's employee to tell him that he had "a message from America [for him] . . . he is going to understand." Docket No. 4 ¶ 39.

---

allegations underlying the Potenza charges focuses on facts relevant to Mr. Amabile's involvement and facts clarifying the nature of Mr. Amabile's visit, along with co-conspirators, to Mr. Marsilio. As a result, the acts of all eight Potenza Defendants are not described.

Later that year, Mr. Amabile and Mr. Valente traveled to Italy where, on October 21, 2013, they drove with Mr. Palmeri and Mr. Vonella in the same vehicle to Mr. Marsilio's office. Id. On their arrival, Mr. Palmeri told one of Mr. Marsilio's employees to "tell him only that I have to leave a message from America, he will understand." Id.

Italian investigators later recorded a conversation between Mr. Vonella and an acquaintance in which Mr. Vonella described the October 21, 2013 visit to Mr. Marsilio as a "job" that was carried out on behalf of his American "friends." Id.; Docket No. 16-5 at 9.

On October 30, 2013, Mr. Marsilio received a letter stating that, "after the various unsuccessful attempts we ask you to contact our representative . . . , don't make us wait anymore." Id.

Mr. Marsilio contacted Mr. Grillo. Docket No. 4 ¶ 39; Docket No. 16-5 at 9. In a conversation recorded by Italian investigators, Mr. Grillo warned Mr. Marsilio that "the ones from America are bad." Docket No. 4 ¶ 39; Docket No. 16-5 at 10. Due to Mr. Marsilio's refusal to pay the one million euros, the Potenza Defendants never succeeded in obtaining the money. Id. at 7.

### c. The United States's Initial Complaint For The Extradition Of Mr. Amabile At Italy's Request And Mr. Amabile's December 2014 Arrest

On December 8, 2014, the United States filed an Initial Complaint for the extradition of Mr. Amabile in this Court and requested that an arrest warrant be issued for Mr. Amabile. Docket No. 4. On December 10, 2014, the Court issued the arrest warrant, and the Government took Mr. Amabile into custody. Id.

**d. Italy's January 21, 2015 Diplomatic Note 220 Seeking Mr. Amabile's Extradition**

On January 21, 2015, the Embassy of Italy submitted Diplomatic Note Number 220 to the United States formally requesting Mr. Amabile's extradition. Docket No. 16-1 at 5. Italy made its request pursuant to the 1983 Treaty, as modified. Docket No. 16-1 at 5. This proceeding followed.

## II. Discussion

### a. Extradition Law Generally

Section 3184 of Title 18, United States Code, provides:

> [w]henever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge or magistrate, to the end that the evidence of criminality may be heard and considered[.]

18 U.S.C. § 3184. Here, on December 8, 2014, upon complaint made under oath by Assistant United States Attorney M. Kristin Mace charging Mr. Amabile with having committed within Italy various crimes addressed by the 1983 Treaty, as modified, I issued a conditional warrant for Amabile's arrest for the purposes of extradition proceedings. Docket No. 4.[13]

Section 3184 of Title 18, United States Code, goes on to provide that

---

[13] During the May 21, 2015 extradition hearing, Mr. Amabile conceded that this Court has jurisdiction over him due to the fact that he was arrested within the Eastern District of New York. Docket No. 27. I agree that this Court has jurisdiction. Mr. Amabile also conceded that he is the same person who Italy seeks to have extradited. Id.; Docket No. 16-4 (Italy's photograph of the man they are seeking depicts Mr. Amabile).

> [i]f, on such [extradition] hearing, [the judge or magistrate authorized to do so by a court of the United States] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, . . . he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention.

18 U.S.C. § 3184.[14]  The Secretary of State, and not the court, makes the ultimate decision regarding whether the extraditee should be surrendered to the requesting country.  Id.; Lo Duca v. U.S., 93 F.3d 1100, 1110 n.10 (2d Cir. 1996).

In conducting its inquiry in an extradition hearing, the court "does not determine the ultimate guilt or innocence of the individual whose extradition is sought."  In re Extradition of Chan Hon-Ming ("Hon-Ming"), No. 06 M 296 (RLM), 2006 WL 3518239, at *3 (E.D.N.Y. Dec. 6, 2006); see U.S. v. Pena-Benscome, No. 05 M 1518 (SMG), 2006 WL 3290361, at *2 (E.D.N.Y. Nov. 13, 2006) ("An extradition hearing is not the occasion for an adjudication of guilt or innocence.").  The inquiry is a "narrow" one that focuses on whether probable cause exists to support the charge for which extradition is sought under the terms of the relevant treaty. See Shapiro v. Ferradina, 478 F.2d 894, 901 (2d Cir. 1973); In re Extradition of Skaftouros, 643 F. Supp. 2d 535, 543 (S.D.N.Y. July 31, 2009); Pena-Benscome, 2006 WL 3290361, at *2. "Evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible."  Charlton v. Kelly, 229 U.S. 447, 457-58 (1913).  For example, in challenging an extradition request, the extraditee may not present evidence to impeach the witnesses' statements, see Germany v. U.S., No. 06 Civ. 1201, 2007

---

[14] During the May 21, 2015 extradition hearing, Mr. Amabile conceded that I have the authority to conduct the extradition proceeding.  Docket No. 27.  I agree that the statute establishes that authority.

WL 2581894, at *8 (E.D.N.Y. Sept. 5, 2007); to establish an alibi, see Abu Eain v. Adams, 529

F. Supp. 685 (N.D. Ill. 1980); or to raise a defense of insanity, see Charlton, 229 U.S. at 462; see

Skaftouros, 643 F. Supp. 2d at 543.

Hearsay is admissible at an extradition hearing. Collins v. Loisel, 259 U.S. 309, 317

(1922). Thus, the certificate of extradition may be based on written statements provided by a

foreign prosecutor, investigator or judge, see Rice v. Ames, 180 U.S. 371, 375-76 (1901); Bovio

v. U.S., 989 F.2d 255, 259-61 (7th Cir. 1993); on authenticated documenting evidence, or on

sworn corroborated statements of cooperating witnesses, Eain v. Wilkes, 641 F.2d 504, 509-11

(7th Cir. 1981). Live witnesses are not required. Yordi v. Nolte, 215 U.S. 227, 231 (1909).

### b. Analysis Of The United States's Complaint For Mr. Amabile's Extradition At Italy's Request

In order to issue a certificate of extraditability, the court must affirmatively determine

"whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and

whether the evidence marshaled in support of the complaint for extradition is sufficient under the

applicable standard of proof." Cheung v. U.S., 213 F.3d 82, 88 (2d Cir. 2000); see In re

Extradition of Rodriguez, No. 08 M 770 (ETB), 2009 WL 393638, at *3 (E.D.N.Y. Feb. 13,

2009); U.S. v. Samuels, No. 09 M 445, 2009 WL 367578, at *3 (E.D.N.Y. Feb. 10, 2009); Hon-

Ming, 2006 WL 3518239, at *3; In re Extradition of Waters, No. 03 M 1072 (CLP), 2003 WL

23185666, at *2 (E.D.N.Y. Nov. 24, 2003).

### i. The 1983 Treaty As Modified Is A Valid Treaty

First, I certify that the 1983 Treaty as modified, pursuant to which Italy's extradition

request is made, is valid and in full force and effect, as attested to by Elizabeth M. Kiingi, an

Attorney Adviser in the Office of the Legal Adviser for the Department of State. Docket No. 16-

1; see Galanis v. Pallanck, 568 F.2d 234, 239 (2d Cir. 1977) (noting that while not controlling,

the Department of State's view on this issue is entitled to respect); see also In re Kuri, No. 04 M 6049 (JD), 2006 WL 1663536, at *3 (D. Ariz. June 14, 2006).[15]

On October 13, 1983, the United States and Italy signed the 1983 Treaty, which is an extradition treaty outlining the process by which one state may request the extradition of an individual ("the Requesting State") from the other state ("the Requested State"). Docket No. 16-1.

On June 25, 2003, the United States and the European Union entered into an Agreement on Extradition between the United States of America and the European Union which required the European Union's Member States, of which Italy is one, to acknowledge in an instrument the application of the European Union Treaty to preexisting extradition treaties with the United States, such as the 1983 Treaty. Docket No. 16-1 at 6-7. In other words, the European Union Treaty required Italy to modify the 1983 Treaty in keeping with the terms of the European Union and United States agreement.

On May 6, 2003, Italy and the United States entered into a bilateral written instrument modifying the 1983 Treaty ("the Instrument"). Docket No. 16-1 at 6-7. An Annex to the Instrument contained the resulting modified version of the 1983 Treaty ("the Annex"). Docket No. 16-1 at 8-17.[16]

Article XII of the 1983 Treaty as modified provides that a Requesting State may seek the Provisional Arrest of a person charged or convicted of an extraditable offense who is within the Requested State. Docket No. 16-1 at 13. Then, in order to properly seek the extradition of that

---

[15] Mr. Amabile concedes that the 1983 Treaty as modified is in full force and effect. Docket No. 22 at 5 n.2 (Mr. Amabile's response to the Government's Complaint seeking his extradition to Italy); Docket No. 27 (Mr. Amabile's concession during the May 21, 2015 extradition hearing).

[16] Going forward, any provision referenced as part of the 1983 Treaty as modified can be located in the Annex at Docket No. 16-1 at 8-17.

person, the Requesting State's extradition request and supporting documents must be transmitted, and certified and authenticated or legalized pursuant to Article X(1) and (7) of the 1983 Treaty as modified. Docket No. 16-1 at 6, 10-12.

Article X(1) of the 1983 Treaty as modified in the Annex provides that "[r]equests for extradition and supporting documents shall be transmitted through the diplomatic channel[.]" Docket No. 16-1 at 10. Article X(7) provides that

> [d]ocuments that bear the certificate or seal of the Ministry of Justice or Ministry or Department responsible for foreign affairs, of the Requesting Party shall be admissible in extradition proceedings in the Requested Party without further certification, authentication, or other legalization. "Ministry of Justice" shall, . . . for Italy, [mean] the Italian Ministry of Justice."

Docket No. 16-1 at 12.[17]

In light of the foregoing, I find the 1983 Treaty as modified to be valid, satisfying the first element of extradibility. Docket No. 16-1.

---

[17] The exhibits that I have cited in the above summary of facts have been presented to this Court in accordance with United States law and in compliance with the requirements of the 1983 Treaty as modified. Mr. Amabile does not contest that the documents are properly certified and authenticated. Docket No. 22. All exhibits were received from Italy are properly authenticated under 18 U.S.C. § 1390, having been certified by Elizabeth M. Kiingi, Attorney Adviser in the Office of the Legal Adviser for the United States State Department. Docket No. 16-1 at 3. Ms. Kiingi states in a declaration to the Court that the documents submitted by Italy in this case "are admissible in extradition proceedings without further certification, authentication or other legalization" because they "bear the certificate or seal of the [Italian] Ministry of Justice, [such that] Italy has complied with the Annex provision on authentication." Id. I have also confirmed that each of the evidentiary exhibits accompanying the extradition request bears the aforementioned seal from the Italian Ministry of Justice. See also Hon-Ming, 2006 WL 3518239, at *7 (E.D.N.Y. Dec. 6, 2006) (holding that the certificate of the consular officer "is conclusive on the propriety and legality of the underlying authentications") (citations omitted).

ii. **The Reggio Calabria Charges**

1. **The Fact Allegations Underlying The Reggio Calabria Charges Are Punishable By Deprivation Of Liberty Of More Than One Year Under Both Italian Law And United States Law**

I find that each of the Reggio Calabria charges against Mr. Amabile meets one of the definitions outlined in Article 2 of the 1983 Treaty as modified for an extraditable offense, which is that it be "punishable under the laws of both Contracting Parties by deprivation of liberty for a period of more than one year or by a more severe penalty." Docket No. 16-1 at 8.

a. **The Allegations Underlying The Narcotics-Importation Charge Constitute An Offense That Is Punishable Under The Laws Of Italy And The United States By Deprivation Of Liberty For A Period Of More Than One Year**

The Reggio Calabria narcotics-importation charge is punishable under Italian law by deprivation of liberty for a period of more than one year. An individual convicted of violating Article 74 of Italian Presidential Decree No. 309 of October 9, 1990 can be sentenced to a minimum term of imprisonment of twenty years, unless the individual only participated (as opposed to, for example, managed) the association, in which case the mitigating circumstance requires a minimum term of imprisonment of ten years. Docket No. 16-3 at 42-49. Either way, Mr. Amabile confronts a minimum term of imprisonment of "more than one year" on the narcotics-importation charge such that it is an extraditable offense under Italian law.

The Government cites federal conspiracy to import a controlled substance into the United States as the counterpart United States offense for the purposes of this extradition proceeding, 21 U.S.C. §§ 960, 963. Docket No. 16. This offense is also punishable under United States law by deprivation of liberty of more than one year. Section 960(b) sets out a range of penalties for a violation of Section 960(a)(1) which vary with the nature and quantity of the controlled

substance.  Here, the Reggio Calabria indictment alleged that the conspiracy sought to import

5,000 kilograms of cocaine, and Section 960(b)(1) states generally that a conviction for the

importation of 5 kilograms or more of cocaine (a controlled substance under United States law)

would result in a term of imprisonment of not less than ten years and not more than life.  21

U.S.C. § 960(b)(1).[18]

In light of the foregoing, I certify that the allegations underlying the Reggio Calabria

narcotics-importation charge constitute an offense that is punishable by Italian law and United

States law by deprivation of liberty for more than one year such that this element of

extraditability is met.

    **b.  The Allegations Underlying The Mafia-Type-Association Charge Constitute An Offense That Is Punishable Under The Laws Of Italy And The United States By Deprivation Of Liberty For A Period Of More Than One Year**

The mafia-type-association charge is punishable under Italian law by deprivation of

liberty for a period of more than one year.  Article 416 of the Italian Criminal Code provides that

a person who forms part of a mafia-type association shall be punished with imprisonment from

seven to twelve years, and nine to fifteen years in the event that the mafia-type association is an

armed one, as the indictment states here.  Docket No. 16-3 at 50.

---

[18] The relevant guideline for 21 U.S.C. § 960 is found in the advisory United States Sentencing Guidelines ("USSG") § 2D1.1, which elaborates that an offense involving more than 450 kilograms of cocaine has a base offense level of 38 for the purposes of a sentencing recommendation.  USSG § 2D1.1; see U.S. v. Perez, No. Cr. 84 (RWS), No. 13 Cr. 952 (RWS), 2014 WL 4979215, at *5 (S.D.N.Y. Oct. 6, 2014) (detailing step-by-step the calculation of the USSG's recommended sentence for an individual convicted of violating Section 960). Assuming, arguendo, that Mr. Amabile has zero criminal history points, a base offense level of 38 for an offender with Criminal History Category I would result in a recommended sentence of 235 to 293 months.

The Government cites federal conspiracy to commit a Racketeering Influenced and Corrupt Organizations ("RICO") Act violation, 18 U.S.C. §§ 1961-1963, as the counterpart United States offense for the purposes of this proceeding. Docket No. 16. This offense is also punishable by deprivation of liberty of more than one year. Section 1963(a) sets out a range of penalties for a criminal RICO conspiracy violation. 18 U.S.C. § 1963(a). A defendant convicted under Section 1962(d) shall be "imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment)," in addition to possible fine and forfeiture. Id.[19]

In light of the foregoing, I certify that the allegations underlying the Reggio Calabria mafia-type-association charge constitute an offense that is punishable by Italian law and United States law by deprivation of liberty for more than one year such that this element of extraditability is met.

2. **The Fact Allegations Underlying The Reggio Calabria Charges Must Provide Probable Cause To Believe That Mr. Amabile's Conduct Is Criminal Under The Laws Of Both Italy And The United States**

Extradition law requires that the facts underlying each of the Reggio Calabria charges provide probable cause to support not only those charges but also charges under corresponding United States laws to meet what is known as the dual-criminality requirement. See Collins, 259 U.S. at 312 (stating that dual criminality means that the offense for which the fugitive is being

---

[19] The advisory USSG indicate that the base offense level for a criminal RICO violation is the greater of 19 or "the offense level applicable to the underlying racketeering activity" which, as discussed above, in this case would be 38. USSG § 2E1.1; see Garafola v. U.S., 909 F. Supp. 2d 313, 338 (S.D.N.Y. 2012) (explaining the application of the USSG §2E1.1 to the calculation of an offender's base offense level). Having already determined that a base offense level of 38 renders Mr. Amabile's acts punishable under United States law by a deprivation of liberty of more than one year, USSG § 2E1.1, I find that the RICO conspiracy offense also satisfies the "more than one year" extraditability standard. See Powell v. U.S., 2014 WL 5092762, at *1 n.1 (D.Conn. Oct. 10, 2014) (noting and discussing USSG § 2E1.1's application to RICO offenses).

extradited must be criminal in both Italy and the United States); Lo Duca, 93 F.3d at 1111 (same).

In identifying which United States laws are analogous to the Reggio Calabria charges, the dual-criminality requirement in this extradition proceeding

> does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions.

Collins, 259 U.S. at 312; see In re Pena Bencosme, 341 F. App'x 681, 684 (2d Cir. 2009) (stating that a court evaluating a question of dual criminality must review whether the conduct of the accused "falls within the proscription of American criminal law") (quotations & citations omitted); Gallo-Chamorro v. U.S., 233 F.3d 1298, 1307 (11th Cir. 2000); Clarey v. Gregg, 138 F.3d 764, 766 (9th Cir. 1998) ("[T]he primary focus [in a dual criminality inquiry] has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Here, as noted above, the Government has suggested, and Mr. Amabile does not dispute, that the Court may use federal conspiracy to import a controlled substance into the United States as the analogous United States law to Italy's narcotics-importation charge, and federal conspiracy to commit a RICO violation as the analogous United States law to Italy's mafia-type association charge. Docket No. 29.

The Government insists that the Court's analysis should stop here, arguing that the dual-criminality requirement does not require the Court to analyze whether Mr. Amabile's conduct satisfies the elements of the United States criminal provisions which have been identified as analogous to the Reggio Calabria charges. Docket No. 29. The Government claims that the dual-criminality requirement only requires that a United States criminal provision exist on the

books which "appear[s] to be directed to the same basic evil" as the Italian law charged, id. (citing Clarey v. Gregg, 138 F.3d 764, 766 (9th Cir. 1998) (quotation & citation omitted)),[20] and "does not require that the elements, purposes, or punishment for foreign offenses be identical to ours," Docket No. 29 (citing U.S. v. Thomas, 322 F. App'x 177, 181 (3d Cir. 2009)).

I disagree with the Government's position that the "same basic evil principle" relieves me of the need to consider whether Mr. Amabile's conduct would actually support charges under the United States laws analogous to the Reggio Calabria charges. See Collins, 259 U.S. at 312 (requiring that the particular act charged in the foreign jurisdiction be "criminal in both jurisdictions") (emphasis added). I fail to see how the existence of United States laws analogous to the Reggio Calabria charges, without more, shows that the allegations of Mr. Amabile's conduct, if true, would be criminal in the United States. Case law supports this interpretation. For example, in United ex rel. Rauch States v. Stockinger, 269 F.2d 681, 685-86 (2d Cir. 1959), the Second Circuit considered the sufficiency of the evidence of the extraditee's conduct to establish probable cause that the extradite committed larceny under New York law. The Stockinger Court stated that it was

> convinced that the facts set out in the depositions provided a reasonable ground . . . to believe that [the] relators committed acts criminal under the laws of Canada. It likewise seems clear to us that the contents of the depositions provided a reasonable ground .

---

[20] I note that in Clarey v. Gregg, 138 F.3d at 765-66, cited by the Government in support of the "same basic evil" principle, the district court conducted, and the court of appeals affirmed, an element-by-element analysis of United States law which the Government claims the "same basic evil" principle does not require. The Clarey court noted that "[b]oth the magistrate judge and district court found that the requirement of dual criminality is met in this case because [the extraditee's] acts . . . would constitute felony murder" under Section 1111 of the United States Code, Title 18, which is "murder . . . committed in the perpetration of . . . robbery." The Ninth Circuit observed that the district judge in that case had said: "I find that the elements of felony murder are met" and stated its agreement that, "[b]ecause [the extraditee's] conduct qualifies as felony murder under United States law, his extradition satisfies the requirement of dual criminality." Id.

> . . to believe that [the] relators committed acts which would be
> criminal under the laws of New York.  It is immaterial that the acts
> in question constitute . . . theft and fraud in Canada and . . . larceny
> in New York State.  It is enough if the particular acts charges are
> criminal in both jurisdictions.

Id.; see In re Pena Bencosme, 341 F. App'x at 684 (The extraditee's act "is clearly criminal

under the laws of the United States, the State of New York, and the Dominican Republic.");

Spatola v. U.S., 925 F.2d 615, 619 (2d Cir. 1991) (affirming the district court's finding that the

extraditee's acts "are clearly illegal [in the United States]" under 18 U.S.C. § 1956 and 21 U.S.C.

§§ 841(a)(1), 846, 953, 963); Hu Yau-Leung v. Soscia, 649 F.2d 914, 919 (2d Cir. 1981) (stating

that "[i]n assessing 'dual criminality,' the proper inquiry is: 'if the individual had committed the

same acts in the United States, would a crime have been committed and would it have been a

felony?'", and finding that the extraditee's acts met that test with respect to a specific New York

State criminal provision); U.S. v. Feldman, 879 F. Supp. 2d 231, 238 (N.D.N.Y. 2012) ("The

doctrine of dual criminality requires that prosecution in the requesting nation be for an act that is

also criminal in the surrendering nation.") (citation omitted); Blakeney v. U.S., No. 10 Civ. 5690

(ARR), 2011 WL 318095, at *6 (E.D.N.Y. Jan. 31, 2011) (finding that the charged facts would

render the extraditee liable for violating a number of federal and state criminal provisions in the

United States); In re Extradition of Chan Hon-Ming, No. 06 M 296 (RLM), 2006 WL 3518239,

at *6 (E.D.N.Y. Dec. 6, 2006) (finding that the dual-criminality requirement was met because the

extradite 'could be charged" pursuant to various United States federal criminal provisions that

constitute felony offenses).

The Government protests that the Second Circuit in Lo Duca, 93 F.3d 1100, 1111 (2d

Cir. 1996), did not conduct an element-by-element comparison of United States and Italian law

to determine whether the subject extraditee's conduct fell within the proscription of American

criminal law.  Docket No. 29.  I disagree.  It is true that Lo Duca held that a United States law

analogous to a foreign charge does not need to have elements which precisely track the elements

of the foreign counterpart, but the Lo Duca Court also ruled that the conduct of the extraditee in

that case "clearly would have constituted a crime under either 18 U.S.C. § 371 or 18 U.S.C. §

1962 had he been prosecuted in the United States."  Lo Duca, 93 F.3d at 1112.  The Second

Circuit's determination in this regard would have required it to consider whether the extraditee's

specific acts aligned with the statutes' elements.

       In addition, I note that the 1983 Treaty, as amended, states that

> [t]he provisions [of the Treaty defining what is an extraditable
> offense] apply whether or not the offense is one for which United
> States federal law requires proof of an element, such as interstate
> transportation, the use of the facilities of interstate commerce, or
> the effects upon such commerce, since such an element is required
> for the sole purpose of establishing the jurisdiction of United States
> federal courts.

Docket No. 16-1 at 8.  In light of this aspect of the 1983 Treaty, if I were to accept the

Government's claim that I should not compare Mr. Amabile's conduct against the elements of

the United States criminal provisions analogous to the Reggio Calabria charges, then the 1983

Treaty's text about the irrelevance of the "interstate commerce" element of United States federal

criminal provisions would be rendered superfluous language.  See Metro. Washington Airports

Auth. v. Citizens for Abatement of Aircraft Noise, Inc., 501 U.S. 252, 280 (1991) ("Going

behind the plain language of a statute in search of a possibly contrary . . . intent is a step to be

taken cautiously even under the best of circumstances.") (citation & quotation omitted).  I am

unwilling to treat this as superfluous language, particularly in light of the fact that courts

mentioning the irrelevance of jurisdictional elements to the dual-criminality requirement

regularly proceed to consider substantive elements.  See Emami v. U.S. Dist. Court for N.D. of

Calif., 834 F.2d 1444, 1450 (9th Cir. 1987) (finding that, setting aside the jurisdictional element of the use of the mails, there was "no doubt" that the extraditee's alleged conduct would be prosecutable under United States law); Parsons v. Feather, No. 13 Civ. 1905 (JO), 2014 WL 2123983, at *3 (D. Or. May 19, 2014) (rejecting the extraditee's argument that the extradition request did not satisfy the dual-criminality requirement because he was not accused of the "jurisdictional element" of transmitting an interstate wire which, in addition to being specifically exempted from consideration by the United States-Mexico extradition treaty, was "not part of the essential character of the acts criminalized by the substantially analogous statutes in both countries"); Hon-Ming, 2006 WL 3518239, at *6 n.10 (stating that a jurisdictional element was not relevant to the determination of dual criminality and finding that the extraditee's conduct "could be charged as a felony offense" if committed in the United States under, inter alia, 18 U.S.C. § 1344, which makes it criminal to "knowingly execute[], or attempt[] to execute, a scheme or artifice . . . to defraud a financial institution"); In Matter of Extradition of Ernst, No. 97 Misc. 1 (HBP), 1998 WL 395267, at *5 (S.D.N.Y. July 14, 1998) (disregarding interstate commerce elements in federal mail and wire fraud statutes when conducting a dual criminality analysis because the United States's extradition treaty with the subject country expressly rendered such jurisdictional requirements irrelevant); Matter of Extradition of Tang Yee-Chun, 674 F. Supp. 1058, 1067 (S.D.N.Y. 1987) ("The acts that [the extradites are charged with committing, if proven, would constitute crimes under United States law. . . . [The relators'] argument that the offenses charged are not extraditable because the jurisdictional element of all federal crimes bars them from being analogous to the requesting nation's crimes is not meritorious.").

3. **The Evidence Marshalled In Support Of The Complaint For Extradition Is Sufficient To Establish Probable Cause To Believe That Mr. Amabile Committed The Charged Offenses And That The Evidence Would Also Support A Charge Under An Analogous United States Law**

Probable cause has been defined as the level of evidence "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." In re Szepietowski, No. 08 M 971 (CLP), 2009 WL 187568, at *8 (E.D.N.Y. Jan. 23, 2009) (citing In re Extradition of Atta, 706 F. Supp. 1032, 1050 (E.D.N.Y. 1989)). A court must "exercise . . . independent judgment . . . to determine the propriety of an individual's extradition" with an eye to the reliability or credibility of the evidence presented. Szepietowski, 2009 WL 187568, at *8. Having reviewed the Government's Affidavit and the Reggio Calabria indictment, I find probable cause to believe that Mr. Amabile's acts, had they been committed in the United States, would establish that he committed federal conspiracy to import narcotics in violation of 21 U.S.C. §§ 960, 963. Docket No. 16.

I find that the evidence marshalled in support of the Reggio Calabria charges against Mr. Amabile is sufficient to support probable cause to believe that Mr. Amabile is guilty of the Italian law and United States counterpart laws cited by the Government in these extradition proceedings. See Lo Duca, 93 F.3d at 1112 (finding probable cause that the extraditee's conduct would have constituted a crime under United States law).

a. **The Evidence Is Sufficient To Establish Probable Cause To Believe That Mr. Amabile Committed A Narcotics-Importation Conspiracy Offense Under The Laws Of Italy And The United States**

The Government argues that the United States equivalent narcotics offense to Article 74(1)-(3) of Italian Presidential Decree 309 of October 9, 1990 is federal conspiracy to import

narcotics in violation of 21 U.S.C. §§ 960, 963.[21]  Docket No. 16.  I find that there is probable

cause to believe that the evidence shows that Mr. Amabile committed a narcotics-importation

conspiracy offense under the laws of Italy and the United States, excluding any interstate

commerce requirement.

As for United States law, Section 960(a)(1) provides, in pertinent part, that

> [a]ny person who . . . contrary to [federal law prohibiting the
> importation of a controlled substance into the United States from
> any place outside thereof], knowingly or intentionally imports . . .
> a controlled substance, . . . [that person] shall be punished as
> provided in subsection (b) of this section.

21 U.S.C. § 960(a)(1).  Section 963 provides that "[a]ny person who attempts or conspires to

commit any offense defined in this subchapter shall be subject to the same penalties as those

prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

21 U.S.C. § 963.

Stated differently, in order to establish that a defendant committed federal conspiracy to

import a controlled substance under United States law as discussed above, the government must

prove that "(1) two or more persons entered into an agreement to import a controlled substance

into the United States from another country, (2) [the d]efendant knowingly and intentionally

became a member of the conspiracy, and (3) [the d]efendant had the specific intent to violate

[Section 960], not just that [the d]efendant knew some crime would be committed."  U.S. v.

---

[21] The United States also cites conspiracy to commit money laundering to promote cocaine
trafficking as an equivalent offense to the Italian narcotics-importation charge, but it does not
discuss that theory in any detail.  Docket No. 16 (citing 18 U.S.C. §§ 1956 (a)(2)(A)).  As I
certify Mr. Amabile's extraditability on the basis of his acts establishing probable cause that he
violated United States law criminalizing conspiracy to import cocaine, I do not discuss the
alternate money-laundering theory.

Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008). It is irrelevant whether the conspiracy came to a successful conclusion. See Ianelli v. U.S., 420 U.S. 770, 777-79 (1975).

As I mentioned above, Mr. Amabile urges that the Court wholly discredit the Reggio Calabria indictment because it quotes transcribed conversations referring to an individual named "Michele" without explaining why Italian authorities believed "Michele" to be Mr. Amabile. Docket No. 22 (citing Docket No. 16-3 at 30-34). I reject Mr. Amabile's invitation because I find that the Government's Affidavit offers sufficient evidence to support the conclusion that there is probable cause to believe that "Michele" is Mr. Amabile. Docket No. 25.

Mr. Amabile also argues that I cannot rely upon the Reggio Calabria indictment because the transcribed conversations described therein never mention the words "drugs," "narcotics" or "cocaine" such that they do not establish his knowing participation in a narcotics-importation scheme. Id. Under Mr. Amabile's argument, the use of code by defendants would permit them to escape liability, an unreasonable position. See U.S. v. Rodriguez, 392 F.3d 539, 545 (2d Cir. 2004) (stating that the government, to show conspiracy, must present some evidence from which it reasonably can be inferred that the person charged with the conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it); U.S. v. Torres, 604 F.3d 58, 69 (2d Cir. 2010) ("The evidence as to [the defendant's] statements and conduct was likewise sufficient to permit an inference that [the defendant] was most likely aware that the [p]ackages contained contraband of some kind."); U.S. v. Miranda-Ortiz, 926 F.2d 172, 176 (2d Cir. 1991) ("The defendant's participation in a single transaction can, on an appropriate record, suffice to sustain a charge of knowing participation in an existing conspiracy."); U.S. v. Roberts, No. 07 Cr. 425 (DLI), 2010 WL 234765, at *7 (E.D.N.Y. Jan. 13, 2010) (upholding a drug-conspiracy conviction against a defendant whose knowledge of the scheme's specific

purpose could be inferred by, inter alia, the defendant's unloading of aircraft baggage from secret compartments inside planes completing international flights and assuring that only co-conspirator baggage handlers helped); U.S. v. Oruche, 2009 WL 90193, at *2 (S.D.N.Y. Jan. 14, 2009) (stating that the government had introduced sufficient evidence to support a verdict convicting the defendant of conspiracy to import and distribute heroin because testimony and intercepted telephone conversations showed that the defendant knowingly participation in a drug conspiracy through the fact that testimony showed that he was the ringleader's "right hand man"; had picked up a drug mule from the airport; was present when the ringleader asked a mule to swallow pellets; and wired a mule money in order to pay for a travel visa); U.S. v. Choullam, No. 05 Crim. 523 (LTS), 2008 WL 3861356, at *4 (S.D.N.Y. Aug. 19, 2008) (stating that a reasonable fact-finder could infer that the defendant agreed with other to import hashish in excess of a certain quantity because a cooperating witness testified that the defendant bragged about his contacts; the defendant discussed future shipments with other individuals).

I reject this argument as well because I find that the Reggio Calabria indictment establishes that Mr. Lupoi and Mr. Valente were involved in the narcotics-trafficking operation such that it is reasonable to infer from context of the purportedly "ambiguous" conversations involving and about Mr. Amabile that they were about the narcotics-trafficking operation. Docket No. 16-3 at 31-32; see U.S. v. Small, No. 03 Cr. 1368 (ARR), 2005 WL 1263362, at *7 (E.D.N.Y. May 27, 2005), vacated by 2006 WL 572857, at *1 (E.D.N.Y. Mar. 8, 2006) (noting that a jury could reasonably infer that the defendant agreed to participate in a scheme on the basis of a vague conversation which "clearly took place against the background of shared knowledge," but later finding that in that case, the government had not established that the parties to the conversation had established the requisite background of shared knowledge); see

also U.S. v. Roberts, 2010 WL 234765, at *8 (E.D.N.Y. Jan.13, 2010) (stating that a jury could infer that the defendant knew that he was involved in a drug scheme due to the totality of the circumstances even though he assiduously avoided the word "cocaine" and referred to it as "stuff" or "thing").

Based on the Reggio Calabria indictment, I find that the evidence establishes probable cause to believe that Mr. Lupoi and Mr. Valente, among others, agreed to import cocaine, satisfying the first element of conspiracy to import a controlled substance. Docket No. 16-3. "[C]onspiracies are secretive by their nature," U.S. v. Svoboda, 347 F.3d 471, 477 (2d Cir. 2003), but Mr. Lupoi's and Mr. Valente's agreement to import narcotics into Italy is reasonably inferred by their knowing commission of overt acts in furtherance of such a scheme's realization, see U.S. v. Reyes, 302 F.3d 48, 54 (2d Cir. 2002) (stating that the inquiry is whether the defendant had knowledge of the scheme's charged aims and evinced, by his actions, an intention to further or promote its unlawful aims). For example, after Mr. Lupoi planned the narcotics shipment to Italy with the help of Mr. Drossos (the liason with the South American supplier), Mr. Lupoi asked Mr. Valente to follow up with Mr. Drossos on the progress of the plan by telephone, and Mr. Valente agreed. Docket No. 16-3 at 31-32. As a result of Mr. Valente's efforts in this regard, in January 2013 he provided a status update on the shipment's progress to Mr. Brillante, along with information about the various individuals working on the project, including Mr. Amabile. Id. at 32. Mr. Lupoi's request that Mr. Valente follow up on the narcotics shipment's progress and Mr. Valente's provision of related status updates are knowing overt acts from which I infer Mr. Lupoi's and Mr. Valente's agreement to import narcotics. See U.S. v. Martino, 759 F.2d 998, 1003-04 (2d Cir. 1985) (holding that the defendant's arrival at a time and place where a heroin transaction was scheduled to occur and where he witnessed an

exchange of money, coupled with statements indirectly indicating that he was the intended eventual purchaser of a portion of the drug, coincidental coming and going with participants in the conspiracy, and more was sufficient circumstantial evidence to show knowing participation in a drug conspiracy); U.S. v. Choullam, No. 05 Crim. 523 (LTS), 2008 WL 3861356, at *4 (S.D.N.Y. Aug. 19, 2008) (denying the motion for a judgment of acquittal of a defendant convicted of conspiracy to import a large quantity of hashish, stating that it was reasonable to infer from the defendant's statements that he had drug-supplier contacts that enabled him to secure "tons" of hashish that the defendant agreed with others to import quantities of hashish beyond the ninety-three kilogram loan with which he was apprehended).

As for the second and third elements of a narcotics-importation conspiracy offense under United States law, I find probable cause to believe that Mr. Amabile knowingly and intentionally became a member of the conspiracy with the specific intent to import an unlawful controlled substance. "[A] defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence" of "a pattern of behavior from which a rational jury could infer knowing participation." U.S. v. Lorenzo, 534 F.3d 153, 161 (2d Cir. 2008). Here, Mr. Amabile engaged in behavior from which a rational factfinder could infer his participation in the narcotics-importation scheme, namely: (1) Mr. Amabile got in touch with Mr. Drossos in order to confirm that the narcotics were "coming and as soon as they come they would call"; and (2) Mr. Amabile asked Mr. Tamburello if the Italy group had any interest in collaborating on a separate drug-trafficking operation using marble as a cover haul, then informing Mr. Cavoto that he had drummed up interest in the "marble" operation such that Mr. Brillante should contact him about it. Docket No. 16-3; see U.S. v. Williams, 453 F. App'x 74, 78-79 (2d Cir. 2011) (upholding the defendant's conviction for narcotics conspiracy on the more rigorous beyond-a-

reasonable-doubt standard because "the evidence [did] not merely point to vague suspicious activity on the part of [the defendant], such as the transfer of money; the evidence suggests that, in exchange for money, [the defendant] made arrangements to supply cocaine to other co-conspirators"); U.S. v. Davis, No. 08 Crim. 664 (FB), 2010 WL 3021901, at *1 (E.D.N.Y. July 29, 2010) (denying the defendant's motion for judgment of acquittal on his conviction for conspiracy to distribute marijuana because the defendant's travel "to Arizona (the source of the shipment) less than a month before the [marijuana] shipment arrived" and statement to a third party "that he was excited to go pick up wheel rims" there would permit a jury to "reasonably infer that, as the arranger and intended recipient of the shipment, [the defendant] was aware of its contents"); U.S. v. Akefe, No. 09 Crim. 196 (RPP), 2010 WL 2899805, at *13 (S.D.N.Y. July 21, 2010) (denying the defendant's motion for judgment of acquittal on a drug conspiracy conviction, finding that it was reasonable for a jury to infer beyond a reasonable doubt that the defendant had knowingly participated in a drug scheme where, inter alia, the defendant knew that his uncle was a heroin trafficker, told a drug courier on the telephone that "[t]his is just my uncle's stuff, I'm just helping him," and arranged to meet the drug courier after she asked whether she should "bring it to [him]").

In light of the foregoing, I find that the evidence establishes probable cause to believe that Mr. Amabile committed federal conspiracy to import a controlled substance as that crime is established under United States law. These same facts provide probable cause to believe that Mr. Amabile is guilty of the Italian narcotics conspiracy charge as well, which makes criminal when three people set up an association for, among other things, importing narcotics. Docket No. 16-3. As a result of the fact that the allegations support an extraditable offense under Italy

and United States law, the narcotics-importation charge satisfies the 1983 Treaty's dual-criminality requirement.

> **b. The Evidence Is Sufficient To Establish Probable Cause To Believe That Mr. Amabile Committed A Mafia-Type-Association Offense Under Italian Law And A RICO Conspiracy Offense Under United States Law**

Article 416 of the Italian Criminal Code provides that a violation occurs when the people forming an association avail themselves of the force of intimidation of the bond deriving from being a member of the association in order to commit crimes. The Government argues that the United States equivalent offense to Article 416 of the Italian Criminal Code is conspiracy in violation of 18 U.S.C. § 371 and the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1963. Docket No. 16; see Lo Duca, 93 F.3d at 1111 (holding "the Italian anti-mafia law appears to be quite analogous to the United States conspiracy law, 18 U.S.C. § 371, and the [RICO] Act, 18 U.S.C. §§ 1961-63").

In order to be convicted of conspiracy to commit a RICO violation, the government must show "that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering" and that "the conduct prong requires only that the conspirators reached a meeting of the minds as to the operating of the affairs of the enterprise through a pattern of racketeering conduct." U.S. v. Applins, 637 F.3d 59, 77 (2d Cir. 2011). Further, to be convicted as a conspirator, the government does not have "to prove that a conspirator knew of all of the criminal acts by insiders in furtherance of the conspiracy"; rather, "one must be shown to have possessed knowledge of only the general contours of the conspiracy." Id. "Indeed, a defendant may be a conspirator even if he knew only one other member of the group, and a single act may be sufficient for an inference of [his] involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy."

U.S. v. Anderson, 747 F.3d 51, 61 (2d Cir. 2014) (quotation & citation omitted).  Whether the conspiracy achieved its aim is irrelevant to a RICO conspiracy charge.  See Ianelli v. U.S., 420 U.S. 770, 777-79 (1975); U.S. v. Perry, 643 F.2d 38, 46 (2d Cir. 1981) ("It is unnecessary to show that the conspiracy actually aided any particular sale of heroin since a conspiracy can be found though its object has not been achieved."); U.S. v. Ulbricht, 31 F. Supp. 3d 540, 564 (S.D.N.Y. 2014) ("As with any conspiracy, the actual success or failure of the venture is irrelevant.").

A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Republic of Colombia v. Diageo N. Am. Inc., 531 F. Supp. 2d 365, 422 (E.D.N.Y. 2007) (citing 18 U.S.C. § 1961(4)).  18 U.S.C. § 1959(b)(2).  RICO "racketeering activity" includes, inter alia, "any offense involving . . . importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance or listed chemical (as defined in [S]ection 102 of the Controlled Substances Act) [such as cocaine], punishable under any law of the United States."  18 U.S.C. § 1961(1)(D); 21 U.S.C. § 812 (defining cocaine as a controlled substance).  In order to prove a "pattern of racketeering activity," the government must prove that the defendant committed "at least two acts of racketeering activity" within ten years of one another, 18 U.S.C. § 1961(5), and that those two acts "are related, and that they amount to or pose a threat of continued criminal activity," H.J. Inc. v. Nw. Bell Tel. Co., 492, U.S. 229, 239 (1989) (emphasis in original).

Here, the evidence supports probable cause to believe that Mr. Amabile committed a RICO conspiracy violation.  As discussed above, the evidence permits a reasonable inference that Mr. Amabile knowingly joined a group of New York-based and Italy-based individuals with the aim to conduct the affairs of a South America-to-Italy narco-trafficking enterprise by virtue

of at least two acts, namely his knowing participation in the initial scheme then his deliberate efforts to coordinate a second narco-trafficking operation using marble as a cover haul. Docket No. 16-3 at 32-33. These two acts occurred in 2012 and 2013; in other words, the two acts occurred within the ten-year period required by RICO to constitute a pattern. 18 U.S.C. § 1961(5). The facts also support a finding of probable cause that Mr. Amabile's acts posed a threat of continued criminal activity because "the enterprise [was] an entity whose business [was] racketeering activity," such that "an act in furtherance of that business automatically carries with it the threat of continued racketeering activity." U.S. v. Burden, 600 F.3d 204, 219 (2d Cir. 2010).

In light of the foregoing, I find that the evidence supports a finding of probable cause to believe that Mr. Amabile's acts constitute a violation of criminal RICO conspiracy under United States law. For many of the same reasons, I find that the evidence shows probable cause to believe that Mr. Amabile is guilty of the Italian mafia-type-association charge which, like the criminal RICO conspiracy, addresses a continuing criminal enterprise. I note that the elements of the Italian mafia-type-association charge are somewhat distinct from RICO, as the offense prohibits an individual group member from availing himself of "the force of intimidation of the [group's] bond" in order to commit crimes such as narcotics importation. Docket No. 16-3. First, as discussed above, the Reggio Calabria allegations are sufficient to show that Mr. Amabile affiliated himself with a group that committed illegal drug-trafficking activity. As to the other elements relating to the prohibition against using "the force of intimidation of the [group's] bond," the Reggio Calabria indictment alleges that the group was known to equip itself with firearms in furtherance of that effort and that the group admitted new individuals to the group through formal inauguration procedures which appeared designed to build a trusted

membership (and that Mr. Valente solicited Mr. Amabile's admission to the group through these procedures). Id. As a result of the fact that the allegations support an extraditable offense under Italy and United States law, the mafia-type-association charge satisfies the 1983 Treaty's dual-criminality requirement.[22]

### iii. The Potenza Charges

#### 1. The Allegations Underlying The Potenza Charge Are Covered By The 1983 Treaty As Modified Because The Allegations Constitute An Offense Which Is Punishable By Deprivation Of Liberty Of More Than One Year Under Both Italian Law And United States Law

I find that the Potenza charge against Mr. Amabile is an extraditable offense. Article 2 of the 1983 Treaty as modified defines an extraditable offense as one that is "punishable under the laws of both Contracting Parties by deprivation of liberty for a period of more than one year or by a more severe penalty," and the aggravated attempted extortion charge meets that standard. Docket No. 16-1 at 8.

An individual convicted of violating Article 629 of the Italian Criminal Code confronts a term of imprisonment of five to ten years, but when the circumstances of Article 628(3) are present, the range of imprisonment becomes six to twenty years. Docket No. 16-5 at 2-3. Due to the fact that Mr. Amabile allegedly attempted, but did not achieve, the extortion, Article 56 could reduce that range to as low as two years to six years and eight months but, even still, the Potenza

---

[22] I reiterate that Mr. Amabile's argument that no drugs were ever seized or observed is irrelevant to this finding, as conspiracy to traffic narcotics does not require that the aim of the conspiracy be realized. Docket No. 30. Agreement and knowing participation to traffic narcotics are the relevant inquiries.

attempted extortion charge is punishable under Italian law by deprivation of liberty for a period of more than one year.[23]

The Government cites 18 U.S.C. § 1951 as the United States counterpart to Italy's aggravated attempted extortion offense. Section 1951 provides that

> [w]hoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person . . . in furtherance of a plan or purpose to do anything in violation of this section shall be . . . imprisoned not more than twenty years[.]

18 U.S.C. § 1951(a). The law goes on to define extortion as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Mr. Amabile's acts would be punishable by deprivation of liberty for a period of more than one year under 18 U.S.C. § 1951.[24] Here, insofar as the Potenza indictment alleged that on October 21, 2013 Mr. Amabile, along with Mr. Valente, Mr. Vonella and Mr. Palmeri, paid Mr. Marsilio's office a visit for the purpose of leaving a threatening message to further the extortion effort, Mr. Amabile's conviction pursuant to 18 U.S.C. § 1951 would result in a term of

---

[23] As a reminder, Article 56 states that an attempted offense is punishable by one-third to two-thirds the term of imprisonment contemplated by the intended offense. Docket No. 16-5 at 2. I used the one-third multiplier to reach the two years to six years and eight months range, making it the lowest possible range. Even still, the aggravated attempted extortion charge satisfies the requirement that the charge be punishable by a deprivation of liberty of more than one year.

[24] The Government also identifies N.Y. Pen. Law § 155.05(e), which criminalizes larceny by extortion, as a New York State law counterpart to Italy's aggravated attempted extortion offense. Docket No. 29. It is unnecessary for me to consider New York's larceny by extortion offense because my analysis of 18 U.S.C. § 1951 satisfies the relevant inquiries I must make to determine Mr. Amabile's extraditability pursuant to the Potenza aggravated attempted extortion charge.

imprisonment between three years and five months and four years and three months.  <u>Docket No. 16-5</u> at 9; 18 U.S.C. § 1951.[25]

> **2. The Evidence Marshalled In Support Of The Complaint For Extradition Is Sufficient To Establish Probable Cause To Believe That Mr. Amabile Committed Aggravated Attempted Extortion Under The Law Of Italy And A Violation Of 18 U.S.C. § 1951**

As previously mentioned, Article 2 of the 1983 Treaty as modified requires that the Court find probable cause to believe that Mr. Amabile's acts as alleged by the Potenza indictment constitute an offense under the law of both Italy and the United States in order to find that the Potenza charge is an extraditable offense.  If probable cause is found as to the law of Italy and the United States, the Government's Complaint for Mr. Amabile's extradition meets the dual criminality requirement.

I find that the Potenza offense for which Italy seeks Mr. Amabile's extradition is "punishable under both Italian and United States criminal law."  <u>Lo Duca</u>, 93 F.3d at 1111.  In <u>Messina v. United States</u>, 728 F.2d 77, 79-80 (2d Cir. 1984), the Second Circuit noted that this dual criminality requirement was met in a case in which "[t]he Italian offenses . . . [were] in the

---

[25] The relevant guideline for a 18 U.S.C. §1951 charge based on these facts is found in the advisory USSG § 2B3.2, which provides that an offense of extortion by threat of injury has a base offense level of eighteen for the purposes of a sentencing recommendation.  USSG § 2B3.2(a); <u>but see</u> USSG § 2B3.1 (applies to 18 U.S.C. § 1951 violations involving robbery); USSG § 2B3.3 (applying to 18 U.S.C. § 1951 violations involving blackmail); USSG § 2C1.1 (applying to 18 U.S.C. § 1951 violations involving bribes).  In addition, USSG § 2B3.2(b)(2) requires that the offense level be increased when "the amount demanded . . . exceeded $10,000."  USSG § 2B3.2(b)(2).  The extent of the offense level increase is determined by reference to USSG § 2B3.1(b)(7), which requires a four-level increase when the amount demanded was more than $850,000.00 but less than $1,500,000.00.  USSG § 2B3.1(b)(7).  In light of the fact that the Potenza Defendants were attempting to extort one million euros from Mr. Marsilio by threat, Mr. Amabile's base offense level of eighteen would be increased by four levels to twenty-two.  Assuming, <u>arguendo</u>, that Mr. Amabile has zero criminal history points, an offense level of twenty-two for an offender with Criminal History Category I would likely result in a recommended sentence of forty-one to fifty-one months.

nature of extortion" because, "[l]ooking to both federal and state law, . . . the extraditing judge had no difficulty in finding similar federal and state statutes."  Here, too, I find that Mr. Amabile's extortive acts are "criminal in both [Italy and the United States]."  Collins, 259 U.S. at 312; see In re Pena Bencosme, 341 F. App'x at 684 (asking whether the accused's conduct "falls within the proscription of American criminal law") (quotations & citations omitted); Gallo-Chamorro, 233 F.3d at 1307; Clarey, 138 F.3d at 766.

Beginning with United States law, "there are two essential elements of a Hobbs Act crime: interference with commerce, and [attempted] extortion."  Stirone v. U.S., 361 U.S. 212, 218 (1960) (citing 18 U.S.C. § 1951).[26]  Attempted extortion pursuant to 18 U.S.C. § 1951 is the attempt to obtain "property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  Mr. Amabile has previously conceded that there is probable cause to support an attempted extortion charge in this case, "based primarily on an allegation that Mr. Amabile was present in a car with others who later approached and threatened a victim, [Mr. Amabile] do[es] not challenge that

---

[26] Although the interstate commerce nexus would be fundamental for an actual 18 U.S.C. § 1951 prosecution in the United States, Article II(4) of the 1983 Treaty as modified in the Annex, which defines extraditable offenses, provides that

> [t]he provisions of this Article apply whether or not the offense is one for which United States federal law requires proof of an element, such as interstate transportation, the use of the facilities of interstate commerce, or the effects upon such commerce, since such an element is required for the sole purpose of establishing the jurisdiction of United States federal courts.

Docket No. 16-1 at 8; see U.S. v. Perrotta, 313 F.3d 33, 37 (2d Cir. 2002) (stating that the interstate commerce requirement is a "jurisdictional nexus [which] transforms the quintessential state crimes of robbery and extortion into federal crimes"); Ernst, 1998 WL 395267, at *6 (disregarding interstate commerce elements in federal mail and wire fraud statutes when conducting a dual criminality analysis because the United States's extradition treaty with the subject country expressly rendered such jurisdictional requirements irrelevant).

charge in this submission." Docket No. 22. I agree. The evidence shows that Mr. Grillo and Mr. Palmeri insinuated to Mr. Marsilio that he would be in danger if he did not pay one million euros and that, after that foundation of intimidation had been laid, on October 21, 2013, Mr. Amabile joined Mr. Palmeri, Mr. Valente and Mr. Vonella for the "job" of visiting Mr. Marsilio's office and leaving him a message "from America, [that] he will understand." Docket No. 16-5 at 9. This establishes probable cause to believe that Mr. Amabile attempted to extort one million euros from Mr. Marsilio through fear because, building upon the earlier threat, Mr. Amabile joined a group of men to traveled to Mr. Marsilio's office to intimidate him further. 18 U.S.C. § 1951.

For the same reasons, I find that the evidence provides probable cause to believe that Mr. Amabile's acts constitute a violation of the Articles charged in the Potenza indictment from the Italian Criminal Code, as Mr. Amabile's presence in the vehicle on October 21, 2013 constituted his participation with several people to intimidate Mr. Marsilio so that Mr. Marsilio would give them one million euros, a wrongful benefit, at his detriment. Docket No. 16-5 at 3.[27]

In light of the foregoing, I find that the evidence marshalled in support of the Potenza charge against Mr. Amabile is sufficient to support probable cause to believe that Mr. Amabile is guilty of violating 18 U.S.C. § 1951. See Lo Duca, 93 F.3d at 1112 (finding probable cause that the extraditee's conduct would have constituted a crime under United States law).

---

[27] Mr. Amabile argues that at times the Government discusses actions of Mr. Lupoi and Mr. Valente in the context of the attempted extortion charge which are unrelated to Mr. Amabile. Docket No. 30. Here, I have focused on the allegations specific to Mr. Amabile and for the reasons stated find them sufficient to show probable cause. In addition, Mr. Amabile argues that the Court should not accept the Government's suggestion that the Court's initial probable cause finding relating to the Potenza charge, based upon the Government's original Complaint for the Extradition of Mr. Amabile, should foreclose a de novo review here. Id. As I have conducted a de novo review, I need not reach the question as to whether that would be proper. Finally, I have not, as Mr. Amabile argued I should not, implied probable cause against him based on the fact that his alleged co-conspirators consented to extradition.

### III.    Conclusion

Having considered the totality of the evidence before this Court, I find that there is a valid treaty—namely, the 1983 Treaty as modified; that the Reggio Calabria charges and the Potenza charge are extraditable insofar as they are punishable under the law of Italy and the United States by deprivation of liberty for more than one year; and that there is probable cause to believe that Mr. Amabile is guilty of the charged offenses as detailed in the Italian submission.

Based on the foregoing, I **grant** the Government's petition for a certificate of extraditability for Mr. Amabile, and the Court hereby certifies this matter to the Secretary of State to further consider the surrender of Mr. Amabile to Italian authorities in accordance with the 1983 Treaty as modified.  A warrant for the surrender of Mr. Amabile may issue upon the requisition of the proper authorities of Italy.  18 U.S.C. § 3184.  It is further ordered that the United States Attorney for this judicial district forward a copy of this Opinion and Order, together with a copy of all transcripts of proceedings and copies of documents received into evidence in this matter, to the Secretary of State for the United States.[28]

Dated:  Brooklyn, New York
      July 16, 2015

 

                                _____/s/_____
                                 VERA M. SCANLON
                           United States Magistrate Judge

---

[28] As this decision as to certification of extraditability cites to the Sealed Affidavit filed by the Government in this case, access to the decision shall for the next five days be restricted to the Parties' attorneys and the Court.  On or before 7/23/2015, the Government must file a letter on ECF indicating whether it makes a motion for the redaction of certain conduct.  If the Government moves for redactions, it must identify what content it would like redacted and why in its letter.  If the event that the Government makes a motion for redactions, Mr. Amabile may oppose on or before 7/28/2015; the Court will schedule argument if appropriate.